**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **KAREN STEVENS,** | : | |
| **Plaintiff,** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | |
| | : | |
| **THE BRYN MAWR TRUST COMPANY,** | : | **No. 19-2418** |
| **Defendant.** | : | |

<u>**MEMORANDUM**</u>

**Schiller, J.**                                                                                  **October 27, 2022**

Plaintiff Karen Stevens, a white woman, began working at The Bryn Mawr Trust Company (the "Bank" or "BMT") in 1998 and was fired on June 6, 2019. The Bank terminated her for her alleged tardiness, failure to cooperate with her coworkers, and lack of cooperation scheduling times to work. Her "case is basically a retaliation case," but she also asserts claims for race, sex, age, and wage discrimination. (Pl.'s Mem. of Law in Opp. to Def.'s Mot. for Summ. J. [Pl.'s Opp.] at 14; *see also* Am. Compl., ECF 2.) The Bank moves for summary judgment on all claims. For the reasons that follow, the Bank's motion is granted.

**I.      <u>BACKGROUND</u>**

In 1998, the Bank hired Karen Stevens as a teller. (*See* Def.'s Statement of Undisputed Material Facts [Def.'s SUMF] ¶ 2; Pl.'s Statement of Disputed Facts in Opp. to Def.'s SUFM [Pl.'s SDF in Opp.] ¶ 2.) Stevens worked part time at the Bank's Bryn Mawr branch, typically for no more than thirty hours per week, but was contracted to work no more than forty hours per week. (*See* Def.'s SUMF ¶ 51; Def.'s Ex. 127; Pl.'s SDF in Opp. ¶ 51.) This flexible schedule allowed her to care for both her mother and sister, who suffered from a severe disability. (Stevens Dep. 124:23-125:18.) For example, Stevens did not work on Tuesdays and would later use this time to care for her family. (*Id.* 124:5-18) Stevens was talented at sales and the Bank gave her pay raises

for her success. (*See Id.* 112:4-13; Def.'s SUMF ¶ 168.) By 2018, Stevens obtained the eighth-highest pay rate of all tellers at the Bank and the second-highest rate amongst part-time tellers. (Def.'s SUMF ¶¶ 7-19; Def.'s Ex. 138.) But despite her sales success, the Bank terminated Stevens on June 6, 2019 after repeated written warnings for tardiness, leaving early, and insubordination. (*See* Def.'s SUMF ¶¶ 3-6 ; Def.'s Exs. 126, 165, 166, 173, 218, 247; Pl.'s SDF in Opp. ¶ 6.)

### A.  Stevens's Allergies and the Bank's Accommodations

In 2010, Stevens told the Bank she had an allergy that required accommodation. (Def.'s SUMF ¶¶ 25-30; Stevens Dep. 10:21-11:15; Def.'s Exs. 54, 136.) She alerted the Bank's Human Resources Department that she could not tolerate the pungent smell of some perfumes, colognes, and aftershaves worn by her coworkers. (*Id.*) These odors caused her difficulty breathing. (Stevens Dep. 11:23-12:4; Def.'s Ex. 54.) The allergy generated friction between Stevens and her coworkers, specifically Michael Dougherty. (Stevens Dep. 11:20-24; Def.'s Ex. 55.) Nancy Pinkowicz, a human resources employee, investigated Stevens's complaints about the friction and held a large meeting about perfume and cologne usage that "embarasse[ed]" Stevens. (Stevens Dep. 11:23-12:21; Pl.'s SDF ¶ 21.) Although embarrassed, Stevens did not believe the Bank's management was harassing employees about perfume. (Stevens Dep. 13:14-16.)

The Bank accommodated her by asking all employees working near Stevens to not use colognes, providing Stevens a fan to disperse any odors, and moving her to an open-area work space. (Def.'s SUMF ¶ 27; Def. Ex. 54.) Pinkowicz and another employee then instructed Stevens to refrain from directly speaking to any employee if she had a concern with his or her cologne or perfume. (Stevens Dep. 13:17-14:12, 15:17-17:17; Def.'s Ex. 54.) Rather, Pinkowicz instructed Stevens to register any concern with her direct supervisor. (Stevens Dep. 16:5-19; Def.'s Ex. 54.) On May 4, 2011, Bank managers hosted a meeting with Stevens, where they told her the Bank had

made all possible accommodations for her allergy and she could not have "any outbursts of any sorts or send emails that are demanding/threatening." (Def.'s Ex. 55; *see also* Def.'s SUMF at ¶ 30.) Stevens did not sign the memorandum memorializing this discussion. (Def.'s Ex. 55.)

### B. <u>Wandrea Russo and the Bank's 2018 Investigation</u>

Stevens was friends with her manager, Wandrea Russo, an African American head teller at the Bryn Mawr branch (Russo Dep. 297:16-17; Stevens Dep. 123:21-24.) Russo levied harassment claims at the Bank, prompting the Bank to launch an internal investigation of her claims in 2018. (Def.'s SUMF ¶ 36; Pl.'s SDF in Opp. ¶ 4.) As part of the investigation, human resources employees Nicola Fryer and Jennifer Stryker met with Stevens on June 4, 2018. (Stevens Dep. 106:5-106:23; Pl.'s SDF in Opp. ¶ 41, Def.'s Ex. 103.)

During the meeting, Fryer and Stryker asked Stevens if she had ever heard any racially offensive comments while working at the Bank. (Def.'s Ex. 103.) Stevens recounted overhearing an offensive comment about a fellow Bank employee. (Stevens Dep. 85:18-86:5; 167:6-18; Def.'s Ex. 103.) She said she was offended when Therese Trainer, a Bank employee, told Richard Rose, an African American Bank teller, to go quickly to the Bank's vault and get a logbook because he was Jamaican and Jamaicans are supposed to be fast. (Stevens Dep. 36:1-17, 114:8-9; Pl.'s SDF in Opp. ¶¶ 41-42; Pl.'s Opp. at 2; Def.'s Exs. 103, 111A.)) Stevens told Rose to file a report because she believed the comment to be harassment. (Def.'s Ex. 103.) Stevens also referenced a time when Trainer called Russo and another African American employee "liars" and made Russo perform additional tasks although others were available. (Stevens Dep. 67:10-12; Pl.'s Statement of Disputed Facts [SDF] ¶ 25; Def.'s Ex. 103). She believed this to be racially charged. Stevens said she also had heard a comment secondhand concerning slavery. (Def.'s Ex. 103.)

Stevens told Fryer and Stryker about additional offensive comments that were directed towards her. She mentioned Trainer's comments that Stevens needed to color her hair and was clumsy. (Stevens Dep. 119:6-12, 121:11-24; Def.'s Ex. 103.) She also mentioned instances where Trainer yelled at her. (Def.'s Ex. 103.) Stevens also raised Trainer's continued use of perfume when working near her despite the Bank's instruction prohibiting it. (Stevens Dep. 119:6-12; Def.'s Ex. 103.)[1]

After the interview, Stevens continued a dialogue with Fryer to discuss Trainer's behavior. (Stevens Dep. 122:1-6.) Stevens claims Fryer told her that, as her manager, Trainer could take away her days off and give her more work if Stevens complained.[2] (*Id.*; *id.* at 125:3-8) Fryer's remarks worried Stevens because she was her mother and sister's caretaker. (*Id.* at 125:9-13.)

### C. **Stevens's Interactions with Cindy Yovanov**

In July 2018, Cindy Yovanov replaced Trainer as the Bryn Mawr branch's manager (Stevens Dep. 27:18-22; Def.'s SUMF ¶ 51; Pl.'s SDF ¶ 8.) When Yovanov and Stevens first met in July 2018, Stevens made it known she was to work no more than thirty hours a week due to her caretaking responsibilities, her work arrangement since she started at the Bank in 1998. (Stevens Dep. 233:8-20.) Importantly, Stevens's sister passed away from lung cancer in June 2018—only one month before Yovanov started at the Bryn Mawr branch. (*Id.* 240:1-4; Pl.'s SDF ¶ 15.) As

---

[1]   Stevens represents that Fryer and Stryker were "not interested" in what she told them during her June 4, 2018 interview and "must not have put down what . . . Stevens said." (Pl.'s SDF ¶ 11.) But Stevens's deposition confirms the contents of Defendant's Exhibit 103—the summary of the June 4, 2018 interview. She offers nothing but her suspicion that Exhibit 103 is incomplete.

[2]   It is not clear from the record who Stevens's direct manager was. In some places, Stevens said Wandrea Russo was her manager and handled scheduling. (Stevens Dep. 123:21-24) ("But really my manager was Wandrea. Wandrea was my head teller and my manager. She was actually supposed to schedule."). In others, she says Trainer was her manager. (Stevens Dep. 27:18-22; 123:11-20). Stevens's testimony suggests Trainer was her official manager and Russo was subordinate to Trainer but effectively her manager.

Stevens and her family mourned, her mother's health also deteriorated. (*Id.*; Stevens Dep. 222:15-17.) Stevens explained her emotionally taxing and time-demanding circumstances to Yovanov. (*Id.* 232:18-233:7.)

Nevertheless, Yovanov gave Stevens additional responsibilities because she believed Stevens was not doing her fair share of work. (Def.'s Mot. for Summ. J at 3.). For the first time in her twenty years at the Bank, Stevens was asked to open the Bryn Mawr branch in the morning. (Russo Dep. 280:11-18, Def. Exs. 128, 132.) Stevens refused and explained to Russo it did not work with her caretaking responsibilities. (Russo Dep. 281:2-12.) But Russo put Stevens—like all other tellers—on the opening schedule upon the order of "management." (*Id.* 281:13-23.) Yovanov, Russo, or other managers also asked Stevens to assist with end of day duties, but Stevens refused. (Def.'s Exs. 127, 132.) Stevens was not trained how to balance the ATM and resisted changes to her work schedule (Stevens Dep. 251:7-252:24; Russo Dep. 279:17-280-5, Def.'s Exs. 129, 132, 143.) Her demands made scheduling other tellers more challenging. (Russo Dep. 280:6-10.)

On July 25, 2018, Stevens showed up late to a meeting due to an emergency with her mother. (Stevens Dep. 242:12-20, 243:7-18; Pl.'s SDF ¶ 16; Def. Ex. 127.) As a result, Yovanov wrote Stevens a disciplinary memorandum that day.[3] (*See* Def.'s Ex. 127.) The memo summarized the interactions described above as well as other incidents. (*Id*; *see also* Pl.'s SDF ¶ 17). Yovanov wrote that Stevens had "not shown a willingness to learn new skills" and had "shown a lack of cooperation." (Def.'s Ex. 127.) The memo concluded with an action plan, stating that "[i]f the organization experiences continued situations involving similar behavior, it will result in

---

[3]    Stevens received the memorandum the next day, July 26, 2018. (Pl.'s SDF ¶ 17.)

additional corrective counseling, up to and including termination." (*Id.*) The memo upset Stevens. (Stevens Dep. 248:16-24.) After receiving it, Stevens repeatedly tried to text Russo to discuss it. (*Id.* 247:2-4; Def.'s Ex. 132.) Two days after receiving the memo, Stevens approached Yovanov in tears and suggested she may not come into work next week and quit. (*Id.*)[4]

When Stevens continued to reject additional responsibility, Yovanov gave her a final written warning for tardiness and unwillingness to cooperate on October 5, 2018. (*See* Def.'s Ex. 165.) Yovanov issued the final warning after Stevens did not assist with a bank project involving the safety deposit boxes. (Def.'s Exs. 163, 164, 166; Pl.'s SDF ¶ 19.) Stevens claims she did help on the project but hurt her wrist or hand and told her coworker she could no longer help and would try next week. (Def.'s Exs. 163, 164, 166; Pl.'s SDF ¶ 19.) Stevens sent an additional email about three weeks later explaining her injury and why she could not finish the project. (Stevens Dep. 351:13-352:5; Def.'s Ex. 170.)

### D. **Stevens's Termination**

Between October 2018 and June 2019, Stevens lodged numerous complaints with Human Resources. She had issues with parking at the Bank. (Stevens Dep. 133:21-24-134:1-14; Def.'s Ex. 191.) Every time she emailed her manager or Human Resources to resolve the parking issue, she labeled it "harassment." (*Id.*) When Yovanov tried to confirm and help with the parking issue, Stevens also labeled this "harassment." (*Id.* 139:13-140:5; Def.'s Ex. 192.) Stevens also complained to Human Resources when she was no longer allowed to use a private lactation room to eat her lunch. (Def.'s Ex. 200.) Stevens had been using the room to escape the scent of perfumes during lunchtime and "get away from the stress . . . ." (*Id.*) Stevens also emailed Human Resources

---

[4]     Stevens testified that she does not remember talking with Yovanov that day. (Stevens Dep. 249:10-250:13.)

when she received a poor work evaluation, calling it yet another example of "harassment and retaliation." (Stevens Dep. 293:11-22; Def.'s Ex. 206.)

Stevens was late for work on November 5 and 7, 2018 and unexpectedly called out from work on December 17 and 31, 2018. (Def.'s SUMF ¶¶ 104-121.) She left the branch early on February 27, 2019 (*Id.* at ¶ 126.)[5]

On June 5, 2019, Stevens was issued a second final disciplinary warning for tardiness. (*See* Def.'s Ex. 218; *see also* Stevens Dep. 273:14-23.) It said Stevens arrived late for work that day, although she testified she was not late. (Def.'s Ex. 218; Stevens Dep. 273:14-23.) The next day, June 6, 2019, Stevens arrived five minutes late and was terminated. (Stevens Dep. 274:13-19, 275:3-5, 280:20-281:3; Def.'s Ex. 247.)

Stevens believed Yovanov was brought in to "systematically get rid of anybody that came forward" and "retaliate and get rid of anybody that knew about" the instances precipitating [Russo's] allegations." (Stevens Dep. 28:1-12; Pl.'s SDF ¶ 8.) But Yovanov contends she did not participate in the investigation about Russo's allegations and had no knowledge of the June 4, 2018 interview. (Yovanov Decl. ¶¶ 5, 32; Def.'s Ex. 127.) Stevens disputes this and claims that Yovanov knew Stevens participated in the Russo investigation. (Pl.'s SDF in Opp. ¶ 21; Pl.'s SDF ¶ 34.)

## II.   <u>STANDARD OF REVIEW</u>

Summary judgment is appropriate where admissible evidence fails to demonstrate a genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Material facts are those "that could affect the outcome" of the proceeding, and "a dispute about a material

---

[5]     Although Stevens disputes much of this in her brief, she offers none of her own evidence to disprove it. (See Pl.'s SDF in Op. ¶¶101-121.)

fact is 'genuine' if the evidence is sufficient to permit a reasonable jury to return a verdict for the non-moving party." *Lamont v. New Jersey*, 637 F.3d 177, 181 (3d Cir. 2011). When the movant does not bear the burden of persuasion at trial, it may meet its burden on summary judgment by showing that the non-moving party's evidence is insufficient to carry its burden of persuasion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). Thereafter, the non-moving party may demonstrate a genuine issue of material fact if it provides evidence sufficient to allow a reasonable finder of fact to find in its favor at trial. *Anderson*, 477 U.S. at 248. "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 192 (3d Cir. 2015) (quoting *Anderson*, 477 U.S. at 252).

In reviewing the record, "a court must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor." *Armbruster v. Unisys Corp.*, 32 F.3d 768, 777 (3d Cir. 1994); *Burns v. Pa. Dep't of Corr.*, 642 F.3d 163, 170 (3d Cir. 2011). The court may not, however, make credibility determinations or weigh the evidence in considering motions for summary judgment. *See Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150 (2000); *see also Goodman v. Pa. Tpk. Comm'n*, 293 F.3d 655, 665 (3d Cir. 2002).

## III.   **DISCUSSION**

Stevens sued the Bank for race discrimination, sex discrimination, hostile work environment on the basis of race and sex, retaliation, age discrimination, and wage discrimination. The Bank seeks summary judgment on all counts. Because Stevens failed to proffer sufficient evidence on which a jury could reasonably find for her on any of her claims, the Court grants the Bank's motion in its entirety.

A. **Discrimination**

All of Stevens's federal and state race, sex, and age discrimination claims are subject to

the *McDonnell Douglas* burden-shifting framework.[6] "To establish a *prima facie* case for disparate

treatment, Stevens must show that: (1) she is a member of a protected class; (2) she was qualified

for the position at issue; (3) she suffered a materially adverse employment action; and (4) the

circumstances of the adverse employment action support an inference of discrimination." *Heredia-*

*Caines v. Lehigh Valley Hosp., Inc.*, 580 F. Supp. 3d 114, 125 (E.D. Pa. 2022) (citing *Whitmore v.*

*Nat'l R.R. Passenger Corp.*, 510 F. Supp. 3d 295, 304 (E.D. Pa. 2020)) (italicization added); *see*

*also See Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 410 (3d Cir. 1999). But there is a significant

distinction between ADEA and Title VII causation: under the ADEA a plaintiff must demonstrate

that the age was the "but for" cause of the employer's adverse decision—not merely a motivating

factor. *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176 (2009). If she establishes a *prima facie*

case, the Bank must offer legitimate, non-discriminatory reasons for the adverse employment

---

6       Stevens asserts race discrimination claims under 42 U.S.C. § 1981, Title VII, and the
Pennsylvania Human Relations Act (PHRA). The *McDonnell Douglas* burden-shifting framework
applies to claims brought under each statute. *See Blakney v. City of Phila.*, 559 F. App'x 183, 187
(3d Cir. 2014); *Tomaszewski v. City of Phila.*, 460 F. Supp. 3d 577, 593 (E.D. Pa. 2020).

        Stevens's sex discrimination claims under Title VII and the PHRA "are [also] subject to
the same legal standard, so the Court will analyze them together." *Davis v. Elwyn, Inc.*, No. 20-
5798, 2022 WL 970842, at *5 (E.D. Pa. Mar. 31, 2022) (citing *Atkinson v. Lafayette Coll.*, 460
F.3d 447, 464 n.6 (3d Cir. 2006)).

        Stevens's age discrimination claims under the ADEA and PHRA are also subject to the
same *McDonnell-Douglas* burden-shifting as claims for race and sex discrimination, so they are
also analyzed together. *Caroll v. Guardant Health, Inc.*, 511 F. Supp. 3d 623, 642 n.86 (E.D. Pa.
2021) (citing *Gress v. Temple Univ. Health Sys.*, 784 F. App'x 100, 104 (3d Cir. 2019)); *Lewis v.*
*Overbrook Sch. for the Blind*, 2022 U.S. Dist. LEXIS 50579, at *10 (E.D. Pa. Mar. 22, 2022)
(citing *Tomaszewski*, 460 F. Supp. 3d at 593).

action. *See Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994). The Bank can satisfy "its burden of production by introducing evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision." *Id.* (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993)).

If the Bank provides a legitimate, non-discriminatory reason for its actions, Stevens must then prove that the Bank's "explanation is merely a pretext for the discrimination." *Tourtellotte v. Eli Lilly & Co.*, 636 F. App'x 831, 842 (3d Cir. 2016). Stevens "must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the [Bank]'s articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the [Bank]'s action." *Id.* (quoting *Tomasso v. Boeing Co.*, 445 F.3d 702, 706 (3d Cir. 2006)). In doing so, Stevens "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the [Bank]'s proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them 'unworthy of credence.'" *Fuentes*, 32 F.3d at 765 (quoting *Ezold v. Wolf, Block, Schorr & Solis-Cohen*, 983 F.2d 509, 531 (3d Cir. 1992)).

1. **Race**

Stevens, who is white, does not assert the Bank discriminated against her based on her own race. Rather, to make out her *prima facie* case for race discrimination under Title VII she must rely on a theory of associational discrimination, which federal courts recognize under Title VII, section 1981, and the PHRA. *See LaRochelle v. Wilmac Corp.*, 210 F. Supp. 3d 658, 693-94 (E.D. Pa. 2016), *aff'd* 769 F. App'x 57 (3d Cir. 2019); *Kengerski v. Allegheny Cnty.*, 435 F. Supp. 3d 671, 677-78 (E.D. Pa. 2020). Under this theory, a plaintiff may assert a claim for racial discrimination based on her association with a member of a protected class—even if the plaintiff is not a member

of the same protected class. *Kengerski*, 435 F. Supp. 3d at 677; *LaRochelle*, 210 F. Supp. 3d at 693. But associational discrimination claims are limited to causes of action that "involve[] more substantial relationships." *Id.* (quoting *Zielonka v. Temple Univ.*, No. 99-2693, 2001 WL 1231746, at *5 (E.D. Pa. Oct. 12, 2001)) (internal quotations omitted). Examples of these substantial relationships include interracial marriages and parent-child relationships. *See LaRochelle*, 210 F. Supp. 3d at 693-94 (listing interracial marriage cases); *Kengerski* 435 F. Supp. 3d at 677-78 (mentioning parent-child case). Merely being "good friends" with a coworker is insufficient. *LaRochelle*, 210 F. Supp. 3d at 694; *see also Baker v. Wilmington Tr. Co.*, 320 F. Supp. 2d 196, 203 (D. Del. 2004) (holding plaintiff's acquaintance with a fellow bank teller was insufficient relationship to make out associational discrimination claim on summary judgment); *Zielonka*, 2001 WL 1231746, at *6 (holding the plaintiff's "friendly acquaintance" with a fellow professor was an insufficient relationship to sustain an associational discrimination claim on summary judgment).

Here, Stevens fails to demonstrate that she had a substantial relationship with any member of a protected class. She bases her race discrimination claims on her association with and support of Russo, the African American head teller at the Bryn Mawr branch who reported alleged racist remarks and instances to Human Resources. (Def.'s SUMF ¶ 36; Pl.'s SDF ¶ 4.) Stevens considered herself to be Russo's friend and reached out to Russo when she was upset by Yovanov's discipline. (Russo Dep. 297:16-17; Stevens Dep. 123:21-24, 247:2-4; Def.'s Exs. 132, 253, 254.) Friendship—even "good" friendship—among coworkers is not enough to make out an associational discrimination claim. *See LaRochelle*, 210 F. Supp. 3d at 694; *Baker*, 320 F. Supp.

2d at 203; *Zielonka*, 2001 WL 1231746, at *6. On the record evidence, Stevens cannot prevail as a matter of law. [7]

The Bank's motion for summary judgment with respect to Stevens's race discrimination claims is therefore granted.

## 2. **Age**[8]

### a. **Hostile Work Environment**

To withstand summary judgment on her ADEA hostile work environment claim, Stevens must show: "(1) [she] suffered intentional discrimination because of h[er] age; (2) the harassment was severe or pervasive; (3) the harassment detrimentally affected [her]; (4) the harassment would

---

[7]    In any event, Stevens forfeited her race discrimination claims under 42 U.S.C. § 1981, Title VII, and the PRHA because she did not mention them in her brief. *Campbell v. Jefferson Univ. Physicians*, 22 F. Supp. 3d 478, 487 (E.D. Pa. 2014) ("[W]hen a plaintiff responds to a defendant's summary judgment motion but fails to address the substance of any challenge to particular claims, that failure "constitutes an abandonment of th[o]se causes of action and essentially acts as a waiver of these issues."); *LaRochelle v. Wilmac Corp.*, 769 F. App'x 57, 59 nn.4-5 (3d Cir. 2019).

[8]    The Bank correctly contends Stevens failed to cite any law to support or even the elements of a hostile work environment claim under the ADEA. (Def.'s Reply, ECF 33 at 9; Pl.'s Opp. at 14-15.) However, the Court does not agree that Stevens's "waived" her age discrimination claims by failing to adequately brief them. (*See* Def.'s Reply in Support of Mot. for Summ. J. [Def.'s Reply] at 8-9.) Although Stevens's devotes very little of her brief to her age discrimination claim—a mere three sentences—and fails to address many of the Bank's argument, this does not constitute waiver of the claim. (*See* Pl.'s Opp. at 14-15.)

The Bank cites *Reynolds v. Wagner*, to support its waiver argument, but the plaintiffs in *Reynolds* failed to even cite to the record. 128 F.3d 166, 178 (3d Cir. 1997). In contrast, Stevens cites to multiple and specific parts of the record. (Pl.'s Opp. at 15.) The Bank's citation to *Greenwood Partners, L.P. v. Cimnet, Inc.* is also inapposite, because many of the cases cited in the decision concern a party's failure to mention a claim at all, which is not the circumstance here. No. 201-06624, 2003 WL 22238981, at *2 (E.D. Pa. Sept. 26, 2003). Also, this situation is more properly characterized as a purported forfeiture rather than waiver because Stevens did not intentionally relinquish this claim. *See United States v. Olano*, 507 U.S. 725, 733 (1993); *Schaeffer v. Saul*, No. 19-1153, 2020 WL 2526938, at *2-3 (W.D. Pa. May 18, 2020).

None of this means Stevens thoroughly briefed this issue. She did not. But the Court will address her claims on their merits because she did not waive or forfeit them.

detrimentally affect a reasonable person in that position; and (5) respondeat superior liability." *Carroll v. Guardant Health, Inc.*, 511 F. Supp. 3d 623, 649 (E.D. Pa. 2021). "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment. Instead, a hostile work environment requires conduct that is severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive[.]" *Id.* (quoting *Wright v. Providence Care Ctr., LLC*, 822 F. App'x 85, 96 (3d Cir. 2020)) (internal quotations and citation omitted). To determine whether such an environment exists, "a court must consider the totality of the circumstances, including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 168 (3d Cir. 2013) (quoting *Harris*, 510 U.S. at 23).

Although Stevens contends she was subjected to a hostile work environment because of her age, she has not set forth sufficient evidence to support her claim. The only evidence she cites to support her age discrimination claim is the Bank's offer of enhanced severance/buyouts for some employees who met particular age and work experience thresholds. (Pl.'s SDF ¶ 38; Pl.'s Opp. at 15.) By the ADEA's plain terms, a voluntary early retirement incentive plan is not *per se* unlawful. *See* 29 U.S.C. § 623(f)(2)(B)(ii). Moreover, Stevens does not point to anything in the record that demonstrates any harassment directed at her based on her decision to accept or reject a buyout. *See Gray v. York Newspapers, Inc.*, 957 F.2d 1070, 1078-79 (3d Cir. 1992). Stevens's supposition that the buyout was to "[get] rid of older workers" (Stevens Dep. 319:2-3) does "not evidence an age bias and [is] neither severe nor pervasive." *Caroll*, 511 F. Supp. 3d at 650; *see*

*also Gray v. New England Tel. & Tel. Co.*, 792 F.2d 251, 255 (1st Cir. 1986) ("The record shows only that [there] was a voluntary, early-retirement program. The record is devoid of evidence that the program was used by [defendant] to force older employees out of the company or that this program was used to force [plaintiff] out of the company in this particular case.") Therefore, summary judgment will be granted as to the age discrimination claims.

### b. Disparate Treatment

Although the parties' briefs focus on a hostile work environment, Stevens's reference to the enhanced buyout package does not support any inference of age discrimination for a disparate treatment claim under the ADEA either. To make out a *prima facie* case of ADEA disparate treatment, Stevens must demonstrate "(1) [she] is at least forty years old; (2) [she] suffered an adverse employment decision; (3) [she] was qualified for the position in question; and (4) [she] was ultimately replaced by another employee who was sufficiently younger so as to support an inference of a discriminatory motive [or she can provide facts that] . . . if otherwise unexplained, are more likely than not based on the consideration of impermissible factors." *Willis v. UPMC Children's Hosp. of Pittsburgh*, 808 F.3d 638, 644 (3d Cir. 2015) (internal citations and quotations omitted). Stevens adduces no evidence to satisfy the fourth element. She was not replaced by a younger worker and the enhanced buyout packages alone do not support an inference of age discrimination. Her subjective belief that age discrimination occurred is not enough to show disparate treatment based on her age. *See id.* at 646 (holding that plaintiff's subjective belief age discrimination occurred cannot support an inference of age discrimination for disparate treatment claim); *Terrell v. Main Line Health, Inc.*, 320 F. Supp. 644, 660 (E.D. Pa. 2018) (same).

### 3. **Sex**[9]

In support of her sex discrimination claims, Stevens asserts that (i) one male bank teller named Anthony earned higher hourly wages than she did, and (ii) male tellers allegedly earned larger raises than she did. (Pl.'s Opp. at 15.) But this is not enough to survive the Bank's motion for summary judgment.

### a. **Hostile Work Environment**

Stevens does not adduce sufficient evidence to establish the first two elements of a *prima facie* hostile work environment claim based on her sex. She was the second-highest paid part-time teller at the entire Bank. (Def.'s SUMF ¶¶ 7-19; Def.'s Ex. 138.) The highest, third-highest, and fourth-highest paid part-time teller at the Bank were all women. (Def.'s Ex. 138.) Stevens had the eighth-highest pay rate of *all* Bank tellers. (Def.'s SUMF ¶¶ 7-19; Def.'s Ex. 138.) The only accounting of wages organized by gender on the record shows female part-time tellers at both the top and bottom of the pay scale. (*See* Def.'s Ex. 138.) The one male employee Stevens singles out as making more than she did—Anthony—was a *full-time* employee. (Stevens Dep. 315:12-16.) Stevens attempt to compare apples to oranges is insufficient to make out a claim for sex discrimination.

To demonstrate a hostile work environment, Stevens must show conditions are "objectively hostile, not just hostile in the plaintiff's view." *Greer v. Mondelez Global, Inc.*, 590 F. App'x 170, 173 (3d Cir. 2014) (citing *Harris*, 510 U.S. at 21); *see also Podobnik v. U.S. Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005) ("To survive summary judgment, a party must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue.")

---

[9]     For the same reasons mentioned above with respect to Stevens's age discrimination claim, the Court does not find Stevens forfeited her sex discrimination claim. *See supra* n.8.

(internal quotations omitted). However, Stevens offers only her personal observation that male tellers received higher raises than she did. Even though she interpreted their pay increases as evidence of sex-based discrimination, more is required to withstand summary judgment. Stevens has not shown any difference in pay was even due to her sex, let alone that any pay disparity was objectively severe or pervasive enough to create a hostile work environment. Accordingly, the Bank's motion will be granted.

### b.  Disparate Treatment

Similarly, Stevens does not produce sufficient evidence to establish the fourth element of a *prima facie* disparate treatment claim based on her sex. "[T]he identification of a similarly situated individual outside of the protected class, who engaged in the same conduct but was treated more favorably, may give rise to an inference of unlawful discrimination, *Mandel*, 706 F.3d at 170. But an employee who holds a different job is not similarly situated. *Id.*

Here, Stevens contends that the fact male tellers—particularly Anthony—made more than she did evidences sex discrimination. (Pl.'s Opp. at 15.) But she has produced only her own conjecture that male Bank employees other than Anthony were paid more than she was, and Anthony was not similarly situated because he was a full-time employee. *See Michael v. Golden Living*, No. 12-314, 2013 WL 4054486, at *4 (M.D. Pa. Aug. 12, 2013) (finding a part-time and full-time employee were not similarly situated for purposes of a sex disparate treatment claim). Therefore, the Bank's motion for summary judgment will be granted as to this claim.

### B.  <u>Retaliation</u>

To prove her retaliation claims under the ADEA, Title VII, the PHRA, and Section 1981 Stevens "must first establish a *prima facie* case under the *McDonnell Douglas* framework by showing": (1) she "engaged in protected activities"; (2) the Bank "took an adverse employment

action after or contemporaneous with the employee's protected activity"; and (3) "a causal link exists" between her protected activity and the Bank's adverse action. *Caroll*, 511 F. Supp. 3d at 650 (internal quotations omitted) (italicization added) (ADEA); *Moore v. City of Phila.*, 461 F.3d 331, 340-41 (3d Cir. 2006) (quoting *Nelson v. Upsala Coll.*, 51 F.3d 383, 386 (3d Cir. 1995)) (Title VII). Protected activities include an employee's filing of formal charges of discrimination against the employer and informal protests of discriminatory employment practices such as making complaints. *Smith v. N3 Oceanic, Inc.*, 717 F. App'x 162, 165-66 (3d Cir. 2017). An adverse employment action must be "materially adverse," meaning "it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Daniels*, 776 F.3d at 195 (quoting *Burlington N. & Santa Fe. Ry. Co. v. White*, 548 U.S. 53, 68 (2006)); *see also Swain v. City of Vineland*, 457 F. App'x 107, 111 (3d Cir. 2012) (noting that "[a] broader definition of adverse action" applies to retaliation claims than discrimination claims). To assess whether protected activity and retaliatory conduct are causally connected, the Court may analyze "the temporal proximity between the two if 'unusually suggestive,'" or in the alternative, "the circumstances as a whole, including any intervening antagonism by the employer, inconsistencies in the reasons the employer gives for its adverse action, and any other evidence suggesting that the employer had a retaliatory animus when taking the adverse action." *Daniels*, 776 F.3d at 196 (quoting *LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 232 (3d Cir. 2007)).

## 1. **ADEA**

Stevens must set forth record evidence she specifically complained about age discrimination to show she engaged in protected activity under the ADEA. *See Klastow v. Newtown Friends Sch.*, 515 F. App'x 130, 133 (3d Cir. 2013) (affirming district court's grant of summary judgment on ADEA retaliation claim when record did not show plaintiff "specifically

complained about age discrimination."); *Barber v. CSX Distrib. Servs.*, 68 F.3d 694, 701 (3d Cir. 1995) (holding that a letter complaining of "unfair treatment in general" but not specifically age discrimination was not ADEA protected activity); *DeSanto v. IKEA N. Am. Servs., LLC*, No. 21-1533, 2021 WL 3562884, at *8 (E.D. Pa. Aug. 12, 2021) ("Simply put, a plaintiff's complaints to an employer must specifically mention age discrimination to constitute protected activity under the ADEA."). However, Stevens offers no evidence that she ever specifically complained about age discrimination to anyone at the Bank. Stevens complained to Human Resources numerous times about a menagerie of issues, including race discrimination, but the record is devoid of any specific complaints of age discrimination. Instead she only points to her deposition conjecture about the enhanced buyout packages. (*See supra* Section III.A.3). More is needed to withstand the Bank's summary judgment motion.

Filing an EEOC complaint is a protected activity. *Tate v. Main Line Health*, No. 03-6081, 2005 WL 300068, at *17 (E.D. Pa. Feb. 8, 2005) (citing *Barber v. CSX Distribs. Servs.*, 68 F.3d at 702). However, Stevens does not direct the Court's attention to any specific age discrimination claim she made in the July 30, 2018 EEOC complaint she filed four days after receiving her July 26, 2018 disciplinary memorandum.[10] (Def.'s SUMF ¶ 24; First Am. Compl. ¶ 8.)

The Court will grant summary judgment in the Bank's favor on Stevens's ADEA retaliation claim because she has not establish the protected activity required for her claim to proceed.

---

[10]    Even if Stevens did complain about age discrimination in her EEOC complaint, she has not established the causal connection required to support an ADEA retaliation claim. She was fired on June 6, 2019, more than ten months after she filed her EEOC complaint. A period of more than ten months is not unusually suggestive of retaliation. *See Williams v. Phila. Hous. Auth. Police Dep't*, 380 F.3d 751, 761 (3d Cir. 2004) (holding a period of over two months was not unduly suggestive); *LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 233 (3d Cir. 2007) (three months is not unduly suggestive); *Petti v. Ocean Cnty. Bd. of Health*, 831 F. App'x 59, 64 (3d Cir. 2020) (six months is not unduly suggestive).

2. **Title VII**

   a. **Stevens's** *prima facie* **case**

   i. *Protected activity*

Under Title VII, an employer may not discriminate against an employee "(1) because he has opposed any practice made an unlawful employment practice by this title, or (2) because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this title." 42 U.S.C. § 2000e-3(a). Participation in an employer-defendant's internal investigation of discriminatory conduct may be protected opposition activity. *Crawford v. Metro. Gov't of Nashville & Davidson Cnty.*, 555 U.S. 271, 273, 28 (2009). For participation in an internal investigation to be protected activity, a plaintiff must have "act[ed] under a good faith, reasonable belief that a violation existed." *Daniels*, 776 F.3d at 193 (citing *Moore*, 461 F.3d at 344) (internal quotations omitted); *see also Kerstetter v. Pa. Dep't of Corr.*, No. 08-1984, 2010 WL 936457, at *11 (W.D. Pa. Mar. 12, 2010) (holding that by participating in an internal sex discrimination investigation, an employee engaged protected opposition so long as he complained of the allegedly violative conduct during the investigation). "This standard requires an objectively reasonable belief that the activity plaintiff opposed constituted unlawful discrimination under the relevant statute." *Daniels*, 776 F.3d at 193-94 (internal quotation and citation omitted).

Here, Stevens has demonstrated she engaged in protected activity when she participated in the June 4, 2018 investigation into discriminatory conduct at the Bank's Bryn Mawr branch. During the investigation, Stevens told Human Resources employees about racially-charged comments, including Trainer's "Jamaican runner" comment to Rose (Stevens Dep. 36:1-17, 114:8-9; Pl.'s SDF ¶¶ 41-42; Def.'s Exs. 103, 111A.) She also shared that Trainer called Russo and another African American employee "liars" and made Russo perform additional tasks when others

were available. (Stevens Dep. 67:10-12; Pl.'s ¶ 25 SDF Def.'s Ex. 103). In addition, she identified a Bank employee's comments about African chattel slavery. (Def.'s Ex. 103). The comments Stevens identified are enough to raise a material question of fact as to whether she had an objectively reasonable belief that she was complaining about unlawful discrimination.[11]

### ii.    *Adverse employment action*

Stevens's brief does not specify any particular event as an adverse employment action. Both parties suggest that the only adverse employment action was her June 6, 2019 termination. (*See* Pl.'s Opp. at 14; Def.'s Mem. of Law in Supp. of Mot. for Summ. J. at 17-18; Def.'s Reply at 7-8). Since neither party argues otherwise, the Court considers Stevens's termination as the only relevant adverse employment action.

### iii.    *Causation*

Stevens participated in the Bank's internal investigation on June 4, 2018. She was fired on June 6, 2019. The period of over a year between the two events is not unduly suggestive of retaliation. *See Williams*, 380 F.3d at 761; *LeBoon*, 503 F.3d at 233. Therefore, Stevens cannot rely on temporal proximity alone to support causation.

But she may rely on the circumstances as a whole to evidence causation through a pattern of antagonism. *Daniels*, 776 F.3d at 196; *Petti*, 831 F. App'x at 64. To do so, Stevens must also present "some evidence that the individuals responsible for the adverse action"—in this case, Yovanov—knew of Stevens's protected conduct when Yovanov terminated Stevens. *Daniels*, 778 F.3d at 196.  The Bank hired Yovanov as the new branch manager in July 2018 and she met Stevens for the first time on July 16, 2018, six weeks after Stevens's Human Resources interview. (Def.'s

---

[11]    Although she does not mention it, Stevens also engaged in protected activity when she filed her July 30, 2018 EEOC complaint. *See Tate*, 2005 WL 300068, at \*17 (citing *Barber*, 68 F.3d at 702).

SUFM ¶ 51.) The Bank cites Yovanov's declaration as evidence that she lacked any knowledge of Stevens's participation in the internal investigation. (Yovanov Decl. ¶¶ 5, 32). Stevens contends Yovanov *did* know of her participation in the internal investigation. (Pl.'s SDF in Opp. ¶ 51.) On the record, there is a material question of fact as to whether Yovanov knew about Steven's protected activity when Yovanov fired Stevens.

Considering all the circumstances, Stevens has set forth enough evidence to raise a question of material fact as to whether there was a causal link between her participation in the internal investigation and her termination. When Stevens and Yovanov met, Stevens was mourning the recent loss of her sister and still caring for her ailing mother (Stevens Dep. 232:18-233:7.) She told Yovanov about her circumstances. (*Id.*) Yovanov nevertheless increased Stevens's responsibilities and changed her schedule in a way that placed serious strain on her caretaking responsibilities. (Def.'s SUMF ¶¶ 51-60). For instance, for the first time in her twenty years at the Bank, Stevens was required to open the Bryn Mawr branch in the morning. (Russo Dep. 280:11-18, Def. Exs. 128, 132.) Additionally, Stevens was given a poor work evaluation and repeated written warnings before being terminated. (Stevens Dep. 293:11-22; Def.'s Exs. 127, 165, 206.) She has set forth sufficient evidence of a pattern of antagonism to establish causation for purposes of the Bank's summary judgment motion. *See Lichenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 307-309 (3d Cir. 2012) (discussing and holding plaintiff established *prima facie* case of causation after defendant fired her for purportedly arriving late at work); *Rivers v. Potter*, No. 05-4868, 2007 WL 4440880, at * 8-11 (D.N.J. Dec. 11, 2007) (finding an inference of causation based on pattern of antagonism despite thirteen-month gap between protected activity and adverse action; *Lin v. Rohm & Hass Co.*, No.11-3158, 2014 WL 141304, at *6 & nn.6-7 (E.D. Pa. Apr. 14, 2014) (finding inference of causation based on pattern of antagonism).

### b. The Bank's Legitimate, Non-Discriminatory Reasons for Stevens's Termination

The Bank has offered a legitimate, non-discriminatory reason for Stevens's termination: her repeated tardiness following a year of performance issues. (Def.'s Mot. for Summ. J. at 1; Def.'s SUMF ¶ 169.)

First, on June 5, 2019, Stevens received a final written warning for tardiness and leaving early. (Def.'s SUMF ¶ 169.)  This final warning referenced the corrective communication Stevens received on July 26, 2018 and her May 15, 2019 work performance review, both of which addressed Stevens' unwillingness to learn new skills and take certain shifts in the schedule and tardiness from work. (*Id.* at ¶ 170; Pl.'s SDF ¶ 17; Def.'s Ex. 127.) Although Stevens maintains she was not late for this June 5, 2019 meeting, she also said she did not remember what she did at work on June 5, 2019. (Stevens Dep. 274:11-12). One day after receiving her final warning, Stevens was terminated after arriving five minutes late for work. (Def.'s Ex. 218; *see also* Stevens Dep. 273:14-23).

Stevens's lateness and performance issues are a non-discriminatory explanation for the Bank's decision to fire her. *See Almodovar v. Freeman Decorating Co.*, No. 06-3707, 2009 WL 704383, at *3 (D.N.J. Mar. 16, 2003) ("[Plaintiff's] repeated tardiness, despite admonitions to the contrary, provide a legitimate non-discriminatory reason for his firing."); *Russell v. Vanguard Grp.*, No. 04-3269 2006 WL 2077010, at *4 (E.D. Pa. July 24, 2006) (Pollak, J.) (holding that plaintiff's tardiness combined with other behavioral issues is a legitimate, non-discriminatory reason for firing); *Baylets-Holsinger v. Pa. State Univ.*, No. 18-60, 2020 WL 3892881, at *8 (W.D. Pa. July 10, 2020) (same).

### c. Pretext

Stevens fails to rebut the Bank's explanation for her termination as pretextual. To show

pretext, Stevens must show both that the Bank's proffered explanation was false and that

retaliation was the real reason for her termination. *Young v. City of Phila. Police Dep't*, 651 F.

App'x 90, 99 (3d Cir. 2016) (citing *Moore*, 461 F.3d at 342). Stevens's brief contends she not

late on June 5, 2019, but at her deposition said she does not remember whether she was late on

that day. (Pl.'s Opp. at 8; Stevens Dep. 274:11-12). Moreover, she agrees that she was, in fact,

five minutes late on June 6, 2019 (Stevens Dep. 274:3-19.) She offers no evidence to show the

Bank was wrong about her absences or tardiness, rather, she only offers her own subjective

belief that the Bank's reason for her termination was pretextual. This is not enough. *See Jones*,

198 F.3d at 413-14 (holding that plaintiff's belief without any evidence is insufficient to

demonstrate pretext on summary judgment); *Ekhato v. Rite Aid Corp.*, 529 F. App'x 152, 156

(3d Cir. 2013) (holding plaintiff's subjective belief of pretext insufficient to defeat a motion for

summary judgment); *Baylets-Holsinger*, 2020 WL 3892881, at *8 (holding plaintiff's "own

subjective belief that the action was retaliatory" insufficient to demonstrate pretext on summary

judgment); *Sawl v. Shulkin*, No. 16-1440, 2018 WL 4501061, at *12 (W.D. Pa. Aug. 27, 2018)

(same).

Stevens has not set forth enough evidence to show that material questions of fact remain

with respect to her retaliation claims and the Court will grant summary judgment in the Bank's

favor.

### C. **Wage Discrimination**

"Unlike the ADEA and Title VII claims, claims based upon the Equal Pay Act . . . do not

follow the three-step burden shifting framework of *McDonnell Douglas*; rather, they follow a two-

step burden-shifting paradigm." *Staniziale v. Jargowsky*, 200 F.3d 101, 107 (3d Cir. 2000)

(italicization added). First, she must establish a *prima facie* case "by demonstrating that employees of the opposite sex were paid differently for performing 'equal work'—work of substantially equal skill, effort and responsibility, under similar working conditions." *Id.*; *see also Johnson v. Fed. Express Corp.*, 604 F. App'x 183, 187 (3d Cir. 2016). To make this *prima facie* showing, a plaintiff may have to offer "independent support" for her belief of inequal pay across the sexes for equal work. *Yan Yan v. Fox Chase Cancer Ctr.*, 627 F. App'x 66, 70 (3d Cir. 2015). If Stevens establishes her *prima facie* case, "the burden of *persuasion* then shifts to the employer to demonstrate the applicability of one of the four affirmative defenses specified in the [Equal Pay] Act." *Staniziale*, 200 F.3d at 107; *see also Johnson*, 604 F. App'x at 187. "Given the fact intensive nature of the inquiry, summary judgment will often be inappropriate." *Brobst v. Columbus Servs., Int'l*, 761 F.2d 148, 156 (3d Cir. 1985).

Nevertheless summary judgment is appropriate here because Stevens fails to offer any independent support of her claim that male and female tellers were paid differently for equal work. *See Clark v. New Jersey*, No. 12-7763, 2017 WL 5513689, at *8 (D.N.J. Nov. 17, 2017) (granting summary judgment when plaintiff offered no evidence "except his own version of the facts"); *Fairclough v. Wawa, Inc.*, 412 F. App'x 465, 468 (3d Cir. 2010) (affirming grant of summary judgment "since the record is devoid of any evidence that [defendant] paid individuals different sexes unequally"). Indeed, she does not even mention her wage discrimination claim in her opposition brief.

Stevens does not direct the Court to any evidence supporting her Equal Pay Act claim. She does contend that male tellers had received greater raises than female tellers (Pl. Opp. at 15.) Her brief references Stevens's own deposition testimony that one male Bank teller, Anthony, made more than she did despite her twenty years of seniority. (Pl. Opp. at 15.) But in her testimony,

responding to the very next question, Stevens admits that Anthony was a full-time teller, while she was part-time. (Stevens Dep. 315:12-16.) Beyond her own supposition, Stevens offers no evidence that would be sufficient to make out a *prima facie* case of wage discrimination The Bank, for its part, produced a breakdown of Bank teller pay organized by gender for the record that reveals no pattern of different payment on the basis of sex. (*See* Def.'s Ex. 138.) Stevens was one of the highest-paid part-time tellers at the Bank.

The Court will grant summary judgment in the Bank's favor on Stevens's Equal Pay Act claim.

## IV.   <u>CONCLUSION</u>

For the reasons discussed above, the Court grants the Bank's motion for summary judgment as to all claims.

An Order consistent with this Memorandum will be docketed separately.